# DEALER MARKETING SERVICES INC.
## EMPLOYMENT AGREEMENT

THIS AGREEMENT ("Agreement"), made and entered into this 1st day of January, 2014 (hereinafter, the "Effective Date"), by and between Dealer Marketing Services, Inc., an Illinois Corporation (hereinafter, the "Company") and Steve Aeschliman, (hereinafter, the "Employee"), an individual currently residing in the State of Illinois.

A.  The Company's business consists of the development and marketing of Promax Online®, Procredit Express™ and Instant Screen software programs proprietary to the Company, reselling of credit bureau reports, hosting and designing websites, and the developing and marketing of various other products including, but not limited to Instant Screen™, Credit Pipeline™, Prospect Renewal™, Market Thief™, Prom all™, ProLink® and BK Online® (such software and products, including all ideas, know how, trade secrets, trademarks, service marks, copyrights and patentable inventions relating thereto, being hereinafter referred to collectively as "Proprietary Materials"), as well as marketing of computer hardware and electronic devices manufactured or developed by third parties.

B.  Company desires to employ Employee in the capacity of Director of the Company's Credit Services and Compliance business. This includes all credit report services, add-on services and other credit related products. Employee desires to accept such employment with the Company on January 6th 2014.

NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES AND COVENANTS AND CONDITIONS CONTAINED IN THIS AGREEMENT, THE COMPANY AND THE EMPLOYEE AGREE AS FOLLOWS:

SECTION 1

EMPLOYMENT

    1.1  **Company's Undertaking.**  Subject to the terms and conditions hereinafter set forth, the Company hereby employs Employee on a "full time" basis to perform such duties and services as the Company shall, from time to time, assign to Employee in connection with the Company's business.

    1.2  **Employee's Undertaking.**  Subject to the terms and conditions set forth, Employee agrees to perform and carry out diligently, faithfully, and to the best of Employee's ability, all duties and instructions assigned or issued to Employee by the Company, to comply with the rules, regulations, policies and procedures of the Company, and to act at all times in the best interests of the Company.

SECTION 2

COMPENSATION

    2.1  **Monthly Salary.**  Employee will be paid a Monthly Guaranteed Salary in the amount of Twelve Thousand Dollars ($12,400.00) payable in two installments of Six Thousand Two Hundred Dollars ($6,200.00) each, one on the 7th day of each month for the 2nd half of the previous month and one on the 22nd day of each month for the 1st half of the current month.. In the event Employee's employment with the Company is terminated during a calendar month, employee's Salary shall be prorated on the basis of the ratio that the number of days worked bears to the total number of working days (which shall be deemed to refer to the days of Monday through Friday, except legal holidays) in such month.

EXHIBIT
A

**2.2 Monthly Commissions.** Employee will be paid a monthly commission in the amount of seven percent (7%) on the <u>**MONTH OVER MONTH NET PROFIT INCREASE**</u> on the following products:

| | |
|---|---|
| Adverse Action Letters | AutoApproval Alert |
| ProCredit Credit Reports and ancillary products | ProMax Credit Reports and ancillary products |
| InstantScreen | ProCredit Compliance Pkg |
| ProCredit Set-up fees | ProCredit Red Flag |
| ProMax Compliance Package monthly fees | ProMax Red Flag transaction fees |
| Regulatory surcharges and other fees | Lender partnerships and referral income |
| Data breach solution & other breach services | Middleware fees |
| Credit Triggers and related services | Credit Report and compliance training fees |
| Other profit categories added from time to time | |

Net Profit shall be determined in accordance with the November 2012 through October, 2013 Profit & Loss statement attached hereto as Exhibit A.

**2.3 Other Compensation.** In addition to the Monthly Commission defined in Section Employee shall also receive the following compensation:
i) Company will provide a monthly car allowance of **$483.00 to Employee**. This amount is the exact monthly allowance employee received from his prior employer. This will expire 12/31/2014 the date Employees tax liability ends. (Employee setup certain tax structures that expire on 12/31/2014 and the car allowance would no longer be needed.)

**2.4 Adjustments to Compensation.** Employee's Salary Compensation shall not at any time during this agreement be reduced, unless such reduction is mutually agreed to in writing by Employee and Company.

**2.5 Vacations.** Employee shall be entitled to vacations and paid holidays in accordance with the standard vacation and paid holiday policies of the Company in effect from time to time.

**2.6 Insurance.** Employee shall be entitled to group medical and other insurance and employee benefits, if any, made generally available by Company to its employees from time to time; provided, however, that nothing in this Agreement shall be construed to require such benefits to be paid to Employee if similar benefits are not generally made available by Company to its other employees.

**2.7 Expenses.** While at the designated headquarters of the Company, branch offices or normal bases of operation, Employee will bear his own home-to-office travel expenses, except Company will reimburse Employee for reasonable lodging and meal expenses. While away from such locations on the business of the Company or its customers or clients, regular and reasonable expenses of travel, including, without limitation, accommodation, food and transportation expenses will be borne by the Company in accordance with the current Company Expense Policy. Company will cover fuel expense for trips from Employee's "Home Office" to the company or as directed by the President & CEO.

<u>SECTION 3</u>

TERM OF EMPLOYMENT, TERMINATION

**3.1 Term.** Employee's employment with the Company shall begin on the Effective Date, and shall continue for a period of five (5) years from the Effective Date. This agreement shall auto-renew on January 1st, 2019 for a period of 2 years, unless either party should deliver its intent not to renew within thirty (30) days prior January 1st, 2019..

**3.2 Termination In the Event of Cessation of Business.** Notwithstanding any other provision of this Agreement to the contrary, Employee's employment shall terminate immediately and without notice, in the event the Company makes a general assignment for the benefit of creditors, in the event the Company becomes subject to any proceeding under the Federal Bankruptcy Code or any other statute of any other jurisdiction pertaining to insolvency or the protection of creditors, in the event Company has new ownership, provided that such cessation of business shall not be established by clear and convincing evidence to have been voluntarily undertaken by Company solely in order for the Company to avoid its obligations under this Agreement or similar agreements with its other employees, if any.

3.3   **Termination for Cause.** Notwithstanding any other provisions hereof, Company may terminate Employee's employment under this Agreement for cause. Such termination shall be evidenced by written notice and supporting documentation thereof to the Employee, which shall specify the cause for termination. For purposes hereof, the term "cause" shall include the inability of Employee, through sickness or other incapacity, to perform his duties under this Agreement for a period in excess of ninety (120) substantially consecutive days; documented fraud; theft of company property or conviction of a felony crime.

3.4   **Compensation in the Event of Termination.** In the event Company terminates Employee's employment with Company without cause Company agrees to pay all Guaranteed Salary to the employee within 60 days of termination.

3.5   **Company Sale.** In the event of a sale of the Company Employee shall be the following:
   a. Employee's Monthly Salary as defined in Section 2.1 times 12 to be paid to Employee within 30 days of the closing of such sale.
   b. An amount equal to two percent (2%) of the sale price of the Company in excess of twenty-five million dollars ($25,000,000) to be paid to Employee with 30 days of the closing of the sale.

SECTION 4

AVOIDANCE OF CONFLICT OF INTEREST

4.1   **General.** While employed by Company, Employee will not engage in any business activity if it conflicts with his duties to Company as defined in the company policy guide.

4.2   **Financial Interests.** Under no circumstances will Employee work for any competitor or have any financial interest in any competitor of the Company; provided, however, that this Agreement does not prohibit investment of a reasonable part of Employee's assets in the public stock or securities of any competitor whose stock or securities are traded on a national exchange.

**Employee has disclosed a small investment in a 10 unit Apartment Complex located in Peoria, Illinois. Employee has disclosed that he has no operational requirements and is an investor only with no regular duties related to the property. This property is held in a Trust Under the name: Aeschliman Properties Inc. Employee owns a 50% stake with a family member in this property. Employee agrees to provide any supporting documentation upon request of the Company. Title Records and a Property Evaluation is on file at the Peoria County Courthouse.**

4.3   **Associations.** Employee shall not, without the prior written or email approval of the Company, enter into any outside associations which, by reason of Employee's association with Company, would impair the independence of the Company with respect to a client of the Company, or constitute a natural or potential conflict of interest for the Company.

Employee has disclosed that he is a member of the AFSA association along with several other auto industry associations. Employee desires to keep these memberships and agrees to cover all expenses and travel related to these obligations at his own expense.

4.4   **Divestiture.** Upon request of the Company, Employee shall timely dispose of any investments and/or sever any associations to avoid any possible impairment of Company's independence or any conflict of interest (actual or potential). Employee shall furnish all relevant information concerning outside investments and associations by policy compliance questionnaires or similar means when requested by Company.

SECTION 5

OWNERSHIP OF EMPLOYEE DEVELOPMENTS

5.1   **Patents, Trade Secrets, etc.** With respect to any ideas, concepts, techniques, inventions, trade secrets, processes or discoveries, including improvements (Hereinafter, collectively "Inventions"), developed, made or conceived by Employee, either alone or with others at any time within or without normal working hours during Employee's employment by Company and which (a) relate in any way to the actual or anticipated business of the Company;  (b) relate in any way to the actual or anticipated

3



research or development of Company; or, (c) are suggested by or result from any task assigned to Employee on behalf of Company, Employee agrees:

**5.1.1 Ownership.** That all such inventions, whether or not patented or patentable, shall remain the sole property of Company;

**5.1.2 Disclosure.** To disclose promptly to an authorized representative of Company all such inventions and all information in Employee's possession as to possible applications thereof to industry and other uses thereof or therefor;

**5.1.3 Non-filing.** Not to file any patent application relating to such inventions except with the prior written consent of an authorized officer of the Company;

**5.1.4 Cooperation.** At the request of the Company, and without expense to Employee, to execute such documents and perform such other acts as Company deems necessary to obtain patents on such inventions in any jurisdiction or jurisdictions and to assign to Company or its designees such inventions and any patent applications, whether or not active, and patents relating thereto.

**5.2 Works of Authorship.** With respect to all copyrights and other intellectual property rights associated with any works ("Works") of authorship developed or created by Employee during the course of performing work for Company or its clients, Employee agrees:

**5.2.1 Ownership.** That all such works shall belong exclusively to Company and shall, to the extent possible, be considered works made by Employee for hire for Company within the meaning of Title 17 of the United States Code.

**5.2.2 Assignment.** To the extent such Works may not be considered works made by Employee for hire for Company, Employee agrees to assign, and automatically assigns at the time of creation of such Works, without any requirement of further consideration, all right, title, and interest that Employee may have therein and thereto.

**5.2.3 Non-filing.** Not to file any application for registration of claim to copyright relating to any such Work except with the prior written consent of Company.

**5.2.4 Cooperation.** Upon request of Company, and without expense to Employee, to take such further action, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to any such assignment referred to in paragraph 5.2.2 hereinabove.

**5.3 Employee Property.** No provision in this Agreement is intended to require assignment of any of Employee's rights in any Inventions or Works if: (a) no equipment, facilities, or Confidential Information (as defined below) of Company was used; (b) the Invention or Work was developed entirely on Employee's own time; (c) the invention or work does not relate to the business of Company or to the actual or demonstrably anticipated research or development of Company; (d) the Invention or Work does not result from any work performed by Employee for Company; and (e) the Invention or Work is exclusively a computer hardware product.

**5.4 Post-Employment, Intellectual Property.** Employee recognizes that Inventions or Works conceived, created or made by Employee, either alone or with others, within twelve months after termination of Employee's employment with Company are likely to have been conceived in significant part while Employee was employed by Company. Accordingly, Employee agrees that such Inventions and Works shall be presumed to have been conceived during such employment by Company unless and until Employee has established to the contrary by clear and convincing evidence.

**5.5 Pre-Employment Invention and Works.**

**5.5.1 Employee Ownership.** All Inventions and Works developed, made or conceived prior to Employee's employment by Company which as of the date of commencement of such employment Employee owned or in or to which Employee had an interest or right, other than those patented prior to such employment, are identified in the attachment hereto identified as Exhibit C. Any such inventions or

4

discoveries not so patented or listed shall be deemed made or conceived during Employee's employment with Company. Subject to the foregoing, Employee shall not be requested or required to assign or disclose any Inventions or Works developed, made or conceived prior to such employment or Information relating thereto.

**5.5.2 Intellectual Property of Prior Companies.** Employee shall not be requested or required to violate, and Employee agrees to respect, any valid obligations Employee now has to prior employers or others relating to proprietary or confidential information and to Employee's Inventions or discoveries. Employee has supplied or promptly shall supply within 10 business days the Company copies of written agreements containing any such obligations.

## SECTION 6

### CONFIDENTIALITY

**6.1   Confidential Information Defined.** "Confidential Information", as used herein, means the whole or any part of any information, data, design, process, procedure, formula or improvement relating to Company's business, products, services, pricing, agents or customers which is not generally known to other persons who could obtain economic value from its disclosure or use. Without any limitation upon the foregoing, Confidential Information shall include the Proprietary Materials, all Inventions and Works as described in paragraph 5 hereof, and all trade secrets as defined by the Illinois Uniform Trade Secrets Acts as amended from time to time, and shall include such information whatever its nature and form and whether obtained, orally or by observation, from written materials or otherwise, by Employee or as a result of Employee's employment by Company.

**6.2   Non-Disclosure.**   With respect to Confidential Information, Employee agrees:
    **6.2.1 Maintenance of Confidentiality.** To hold all such Confidential Information in strict confidence, and not publish or otherwise disclose any thereof to any third person or entity.

    **6.2.2 Precautions.** To use all reasonable precautions to assure that all such information is properly protected and kept from unauthorized persons.

    **6.3.3 Non-Use.** To make no use of any such information, except such use as required in the performance of Employee's duties for Company.

**6.3 Maintenance of Confidentiality.** To hold all such Confidential Information in strict confidence, and not publish or otherwise disclose any thereof to any third person or entity. If at any time Employee is asked to disclose company information known to be covered under a non-disclosure agreement Employee shall refuse such request and document the incident. Employee agrees to keep all company information, 3rd party partner information and all other protected information Confidential and shall not disclose it to any party outside of the company.

**6.4 Precautions.** To use all reasonable precautions to assure that all such information is properly protected and kept from unauthorized persons.

**6.5 Non-Use.** To make no use of any such information, except such use as required in the performance of Employee's duties for Company.

**6.6   Exceptions.**   The restrictions contained in this paragraph 6 shall not be construed to apply to (1) information generally available to the public; (2) information released by Company or its clients, agents or contractors, as the case may be, generally without restriction; (3) information independently developed or acquired by Employee without reliance in any way on other protected Information of Company or its agents , clients or contractors; (4) information approved by Company or its agents, clients or contractors, as the case may be, for Employee's use and disclosure without restriction. Notwithstanding the foregoing restrictions, Employee may use and disclose any information to the extent required by an order of the court or other governmental authority, only after Company or its clients, agents or contractors, as the case may be, have been notified and have had the opportunity, if possible, to obtain reasonable protection for such information in connection with such disclosure.

5

## SECTION 7

### RETURN OF MATERIALS

Upon request of Company and, in any event, upon termination of Employee's employment, Employee will leave with Company all memoranda, notes, records, drawings, manuals, disks or other written materials and all substances, models, mechanisms and the like containing or relating to information, inventions or discoveries referred to in subparagraphs 5.1, 5.2, 5.4 and Section 6 of this Agreement, all of which materials and other things shall be and remain the sole property of Company. For this purpose, "written materials" shall be deemed to mean and include without limitation, letters, memoranda, reports, notes, notebooks, books of account, data, customer lists, drawings, prints, plans, specifications, formulae, electronic and computer storage devices or media and all other documents or writings, and all copies thereof.

## SECTION 8

### CONTINUING OBLIGATIONS

Employee's obligations under paragraphs 6 and 7 above shall remain in effect both during Employee's employment with Company and thereafter, whatever the reason for termination of such employment, and shall survive the termination of this Agreement.

## SECTION 9

### RESTRICTIONS OF COMPETITION

**9.1 Non-Competition.** Employee shall not, directly or indirectly (whether as owner, partner, consultant, employee or otherwise), at any time during the period of one year following termination for any reason of Employee's employment with Company, engage in or contribute Employee's knowledge to any work or activity within the United States or Canada, that involves a product, process, apparatus, service or development on which Employee worked or with respect to which Employee had access to Confidential Information while employed by Company.

**9.2 Consent.** Employee shall be permitted to engage in the proposed work or activity referred to in paragraph 9.1, and Company shall furnish Employee a written consent to that effect signed by an officer, if Employee shall have furnished to Company clear and convincing evidence, including assurances from Employee and Employee's new employer, that the fulfillment of Employee's duties and such proposed work or activity would not likely cause Employee to disclose, base judgements upon, or use any Confidential Information.

**9.3 Notification to Company.** Employee agrees to promptly notify Company if Employee receives any offer of employment that involves the activity described in paragraph 9.1 hereof if the employment might commence within twelve (12) months after the termination of Employee's employment with Company. Such notice shall be in writing and shall contain a complete description of the terms of the offer, including the position and compensation offered. After Employee has so notified Company, and once Employee has indicated that Employee intends to accept the offer if Company so permits, Company shall have fifteen (10) days to elect:

**9.3.1 Release.** To release Employee from the restrictions contained in paragraph 9.2, but only with respect to the particular employment position offered to Employee; or

**9.3.2 Insistence Upon Compliance.** To insist on full compliance with the restrictions contained in paragraph 9.1 hereof; provided, however, that in the event Employee's employment with Company is to be or is terminated as a result of the sale or cessation of Company's business by Company and is involuntary, then and in that event Company will provide Employee with special benefits during that period of time these restrictions apply and Employee is still not employed. These special benefits shall consist of the bona fide base salary promised to Employee under the terms of the pertinent job offer, plus 20 percent of the sum of such salary and any bona fide bonus promised to Employee that is not subject to any contingency (e.g., future profitability). So long as Company pays Employee the special benefits described in this subparagraph 9.3 Employee will diligently pursue other employment opportunities that are consistent with paragraph 9.1 hereof and with Employee's general skills and

6

Employment Agreement – Steve Aeschliman 01-08-14



interests.

9.4 **Continuing Obligations.** Following the expiration of said one year period, Employee shall continue to be obligated not to use or disclose Confidential Information so long as it shall remain proprietary and protectable as confidential or trade secret information of Company.

9.5 **Reasonableness of Restrictions.**

9.5.1 **Employee's Concurrence.** Employee has carefully read and considered the provisions of this Section and, having done so, agrees that the restrictions set forth herein (including, but not limited to, the time period of restriction and the geographical areas of restriction) are fair and reasonable and are reasonably required for the protection of the interests of Company.

9.5.2 **Savings.** In the event that, notwithstanding the foregoing, any of the provisions of this Section shall be held to be invalid or unenforceable, the remaining provisions thereof shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included therein. In the event that any provision relating to the time period and/or areas of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time period or areas such court deems reasonable and enforceable, said time period and/or areas of restriction shall be deemed to become and thereafter be the maximum time period and/or areas which such court deems reasonable and enforceable.

## SECTION 10

### MISCELLANEOUS

10.1 **Equitable Relief.** In the event of any breach by Employee of any covenant contained in Sections 5 - 9 of this Agreement, the resulting injuries to Company would be difficult or impossible to estimate accurately, but it is certain that injury or damages will result to the business of Company. Employee therefore agrees that, in the event of any such breach, Company shall be entitled, in addition to any available legal or equitable remedies for damages, to an injunction to restrain the violation or anticipated violation thereof. Should Company have any basis to seek such legal and equitable action, Employee shall pay any and all attorney fees and court costs that Company may incur. Company's rights under this section shall be in addition to every other remedy (equitable, statutory, legal, or contractual) to which Company may be entitled.

10.2 **No Assertion of Rights.** It is expressly understood and agreed that, as between Company and Employee, all rights, title, and interest in and to Inventions, Works and other Confidential Information and any other material furnished to Employee pursuant to this Agreement vests solely and exclusively in Company, and Employee shall neither derive nor assert any title or interest in or to such intellectual property.

10.3 **No Agency.** Employee represents that he is acting on his own behalf and is not acting as an agent or on behalf of any third party.

10.4 **Notices.** All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be considered effective when deposited in the U.S. mail, postage prepaid, and addressed to the appropriate party at the address noted below, unless by such notice a different address shall have been designated.

10.5 **Governing Laws.** All questions concerning the validity, operation, interpretation, and construction of this Agreement will be governed and determined in accordance with the laws of the State of Illinois and of the United States where applicable and preemptive of state law.

10.6 **No Waiver.** Neither party shall, by mere lapse of time, without giving notice or taking other action hereunder, be deemed to have waived any breach by the other party of any of the provisions of this Agreement. Further the waiver by either party of a particular breach of this Agreement by the other shall not be construed or constitute a continuing waiver of such breach or of other breaches of the same or other provisions of this Agreement.

**10.7 Force Majeure.** Neither party shall be in default if failure to perform any obligation hereunder is caused solely by supervening conditions beyond that party's control, including acts of God, civil commotion, strikes, labor disputes, and governmental demands or requirements.

**10.8 Section Headings, Exhibits.** Section and subsection headings used herein are for reference and convenience only and should not enter into the interpretation hereof. The exhibits referred to herein and attached hereto are incorporated herein to the same extent as if fully set forth herein.

**10.9 Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law the remaining provisions of this Agreement will remain in full force and effect.

**10.10 Assignment.** Neither party may, without the prior written consent of the other party, assign or transfer this Agreement or any obligation incurred hereunder, except by merger, reorganization, consolidation or sale of all or substantially all of Company's assets. Any attempt to do so in contravention of this section shall be void and of no force and effect.

**10.11 Scope of Agreement, Amendment.** The parties hereto acknowledge that each has read this Agreement, understands it, and agrees to be bound by its terms. The parties further agree that this Agreement is the complete and exclusive statement of agreement and supersedes all proposals (oral or written), understandings, representations, conditions, warranties, covenants, and other communications between the parties relating hereto. This Agreement may be amended only by a subsequent writing that specifically refers to this Agreement and is signed by both parties, and no other act, document, usage, or custom shall be deemed to amend this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives as set forth below.

Dealer Marketing Services, Inc.  
5401 Elmore Avenue, Suite 200  
Davenport, IA 52807  
By: _____ CEO  
Date: 1-9-14

Steve Aeschliman  
21 Warwick Circle  
Morton, Illinois 61550  
By: _____  
Date: 1-9-2014

8

Employment Agreement – Steve Aeschliman 01-08-14

# TERMIANTION AGREEMENT & WAIVER
## Steve Aeschliman (Consultant) and Dealer Marketing Services Inc.
### PRIOR AGREEMENT TERMINATION

This Consulting Agreement is made as of this 5th day of February 2012 by and between Steve Aeschliman (the "CONSULTANT") and the Private Consulting Firm he owns Consumer Credit Partners (CCP) a Private Sole Proprietorship Consulting business and the company owned & operated by John E. Palmer Dealer Marketing Services Inc. (the "Company") hiring Steve Aeschliman as a paid outside consultant. Dealer Marketing Services Inc is an ILLINOIS CORPORATION with its principal office at 5401 Elmore Ave Davenport, Iowa 52807 Suite 200 owned and operated by John Palmer who also serves as the President & CEO overseeing all operations, design and sales of products and services offered by the Company.

The Company is engaged in the development and the sale of Automotive Dealership Software, Custom Credit & Compliance Software, Sales of Consumer Credit Reports, Compliance and Credit Marketing Solutions. These solutions are sold to dealers throughout the United States and are available in all states.

At the request of the President & CEO John Palmer this agreement has been drafted, reviewed and amended with language sent via email and text message that over a period of 32 days have been negotiated and documented in this agreement. **All pervious verbal and or written agreements if they exist were between John Palmer the individual and Steve Aeschliman the "Consultant" and not the company.**

Prior to the date of this agreement all known agreements were verbal and between John Palmer the individual and Steve Aeschliman the "Independent Consultant". All work performed by Steve Aeschliman was completed during non-working hours and have had no impact on Consultants full time employer TransUnion LLC.

### TERMS OF PRIOR VERBAL AGREEMENT MADE IN AUGUST 2009
The Consultant at the request of John Palmer agrees to terminate the prior VERBAL AGREEMENT and absolve all prior unpaid services as "PAID" or "RESOLVED".

### OWNERSHIP RIGHTS & METERIAL OWNERSHIP
At the request of John Palmer the following terms have been added.
All work, design and concepts provided to John Palmer are now owned entirely by John Palmer with no additional payments due. Steve Aeschliman agrees to forfeit any claim in past work, products and designs and have NO FUTURE CLAIM to compensation of any kind.

Agreed to on February 5th, 2012 by Consultant Steve Aeschliman.

Consultant: _____  Date: 2/5/2012

**EXHIBIT B**

1/08/2012

1

# CONSULTING AGREEMENT
### INCLUDING COMMISSION PLAN PROMIDED FOR RBP
### NEW AGREEMENT BETWEEN DMS & STEVE AESCHLIMAN

### RETENTION OF CONSULTANT
The Company hereby retains Consultant, and Consultant hereby agrees to render consulting services to the Company, upon the terms and conditions set forth herein.

### DUTIES AND CONSULTING SERVICES
Consultant agrees that, as a independent contractor, he will perform all services requested of him by the Company, acting through its authorized representatives and as directed by the companies President & CEO John Palmer. All work requests must be sent by John Palmer and approved by him prior to the start of the work request. All other work regardless of source must have documented proof via email, text or in writing that John Palmer the acting President & CEO of Company approved the requested work.

### COMMUNICATION – ADDED BY CONSULTANT
Authorization can be obtained by email, phone or by text message. *(Text messages are the preferred method of contact and used frequently by John Palmer over the entire period of the prior verbal agreement. John Palmer lives in Chicago, travels frequently and uses text messaging as a regular way to contact and discuss details of consulting work requests. Therefore this section has been added by Consultant to allow for this method of communication. Consultant will make a best effort to record and print text messages when possible.)*

### INDEPENDENT CONTRACTOR STATUS
The parties recognize that Consultant is an independent contractor and NOT EMPLOYEE, co-venturer, or representative of the Company. Consultant shall at all times disclose that he is an independent contractor of the Company and shall not represent to any third party that he is an employee, agent, or co-venturer. Consultant agrees to if asked disclose only that work is performed as an independent contractor and that all work requests are requested from consultant as outside services consulting. The Company shall not withhold any funds from Consultant for tax or other governmental purposes, and Consultant shall be responsible for the payment of same. Consultant shall not be entitled to receive any employment benefits offered to employees of the Company, including but not limited to: workers' compensation coverage; retirement savings or profit sharing plans; stock option, incentive, health, dental or life insurance coverage; and paid vacations. The Company shall not exercise control or restrict FULL TIME WORK by the Consultant so as long as all work performed at the request of the company is kept private and confidential. Consultant must disclose within 10 days that a change of employment has taken place and his current employer TransUnion LLC no longer employs that consultant on a full time basis.



1/08/2012

2

### COMPENSATION -- PAID BY COMPANY TO CONSULTANT

The Company shall pay to Consultant, as compensation for the services to be rendered, the sum of $2500 per month as a **fixed monthly fee** for work performed by the consultant for the Company. The Company agrees to pay consultant this fee in consideration for any and all work request, designs and consulting work performed during the prior 30-day period. Consultant shall report to John Palmer, or to such other employee of the Company as the CEO John Palmer may designate from time to time. Consultant may at any time ask for written approval by John Palmer the CEO for verification that the work being requested is approved and is "approved work" as defined by this agreement.

Company agrees to make payment in the form of cash and or if requested by John Palmer billed to the company credit card provided by the COMPANY CONTROLLER or other Employee as directed by John Palmer. All credit card charges will be billed using the Consulting Firm "CCP" and shall appear on the statement as CCP or similar and shall be processed using the CCP company Intuit G0-Payment System. (See www.gopayment.com) Steve Aeschliman established merchant services under the consulting firm name to process payment for Dealer Marketing Services. (Due to the requirements of obtaining a Merchant Account Intuit Go payment required enrollment using the CCP Business name and would not allow Consultant to process more than $1000 per month using a personal merchant account. Therefore all future charges will appear as CCP or similar on the card statements. This has been explained to the company CEO and CFO and as of the date of this agreement the credit card (AMEX PLUM CARD) has been enrolled for scheduled payments. (See attached for the Authorization Form)

CCP may upon written or verbal consent bill fees to Company each month as directed by the President and CEO John Palmer. Verification for ANY and ALL disputed invoices shall be sent directly to Steve Aeschliman at SteveAeschliman@gmx.com. If billed and not disputed within (30) Days Company shall have no right to dispute charges after the 30th day. Consultant shall be paid no later than thirty (30) days after the receipt of such undisputed amount.

### OTHER COMPENSATION & COMMISSIONS

In 2011 Consultant recommended the strategy to design, implement and bill end users for RBP transactions. This business was created as a new strategy and revenue stream and required no capital investment or development of any kind. At the time John Palmer and Steve Aeschliman (Consultant) promised verbally that Consultant should receive a $0.019 commission incentive for each unit billed AND PAID by all dealerships on a monthly basis. This commission shall be paid monthly to Steve Aeschliman Consulting Company CCP.

### VOLUME REPORTING

At the end of each month Company agrees to provide Steve Aeschliman an accurate reporting of total units billed as required above. This report shall be sent to SteveAeschliman@gmx.com and Reports@CCPData.com to list all transactions and allow Steve Aeschliman to calculate commissions due.

The commission shall be paid by auto credit card debit on the day CCP receives the management report setup to track and monitor volume for risk based pricing units sold. This agreement shall serve as the "authorization" to auto debit the payment from the card on file for these transactional commissions. If report is not sent as required consultant shall use the prior months volume (minus) 10% to compute the first round billing. Consultant will obtain accurate records from the company CEO or CFO and bill for any shortfall monies owed only after the correct and accurate accounting can be computed. Consultant will then bill Company for transactions not billed in prior month before the end of the next cycle.

## TERM OF AGREEMENT
This Agreement shall commence on ~~Feb 5th~~ , 2012 and shall continue until December 30th 2015 unless parties both agree in writing to terminate the agreement or if company is dissolved in a Company Liquidation or Bankruptcy as defined below.

## TERMINATION IN THE EVENT OF OWNERSHIP CHANGE
Company may transfer this agreement so as long as the new owners agree to the same terms and conditions outlined in this agreement. If sold new owners must provide a signed written authorization to assume the liability and payments due under the terms of this agreement.

## TERMINATION IN THE EVENT OF OWNERSHIP
Company (or Sole Owner John Palmer) shall have the right to terminate this agreement so as long as the below terms are met.

So as long as company has paid the flat monthly fixed consulting fee on time and has <u>no payment due or past balance</u> at the time of sale the company it can be canceled with 48 hour notice so as long as Company releases consultant from future work requirements and requires no new consulting work to be completed. The new owners would not unless a new contract was created under the new owners demand work or services from consultant.

## COMMISSONS (OR) "ROYALTIES" FOR RBP OR OTHER SIMILAR WRITTEN COMMISSIONS THAT ARE RECORDED IN WRITING AND SIGND BY JOHN PALMER THE CEO OF THE COMPANY:
As outlined in the above Commission Section consultant is paid monthly for "Commissions" as outlined in this agreement or in writing that has been agreed to and signed by both parties.

If the new owners of the company DO NOT WISH TO ASSUME the requirements outlined and agreed. Company shall pay Consultant according to the terms and conditions below. The calculation would need to be made at the time of the sale and payment is required within 10 businesses days.

1/08/2012                                                                                         4

The 10-day payment period begins and starts on the 1st day after the checks become accessible and "available" for use as payment. Consultant agrees to extend payment period for up to 60 days in the event a third party processing payments or checks require additional time to verify funds and make them available. Notice in writing is required to extend period and must accompany documentation showing this new "authorization and verification period".

**To compute a (1) time settlement or upfront payment to settle current monthly and future monthly monies due to consultant as commission or royalty income the following process should be used to calculate settlement amount and the upfront payment required to terminate.**

To calculate the (1) time settlement the following should be completed prior to payment. Payment can be sent at anytime so as long as the funds can be verified and presented for payment immediately.

**Prior 12 Months Average Monthly Volume of all RBP Products = XXX,XXX**
**Take the Average Monthly Units of all RBP Billable Transactions and Multiply by Commission Rate of $.0198 per unit to get the = Average Monthly Commission**

Then to get the total estimated amount to be paid over the remaining term take the Average Monthly Commission and multiply by Remaining Months of this agreement. This would give you total amount of commission or money that would likely (so as long as the business doesn't significantly decline) be earned by consultant and to be paid by the company on a monthly basis over the term of this agreement.

FINAL SETTLEMENT AMOUNT TO BE PAID (USE BELOW TO CALCULATE)
To get the required settlement amount calculate it by taking the TOTAL AMOUNT OF THE REMAINING TERM AND MULTPLY BY _30.00_ %. This provides the consultant Steve Aeschliman with _30.00_ % of what would have been earned over the full term of reaming months had the company not been sold. This percentage is a "portion of" and shall be decided by John Palmer and Steve Aeschliman on the date this agreement is signed. After payment all past, future and existing balances for all work performed will be canceled and considered settled. No future consulting fees or commission are due for any reason once final payment is made to settle the "Commission Payments" section.

<u>EXAMPLE CALCULATION</u>

All written requests, mail, 1099's and official documents should be mailed to the following address or requested by consultant:

21 Warwick Circle
Morton, Illinois 61550
ATN: C/O Steve Aeschliman

1/08/2012                                                                                                                                           5

NON DISCLOSURE OF COMPANY SECRETS AND TRADEMARKS
Consultant shall not, at any time during or after the term of this agreement, in any manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, corporation or other entity, or use for his own benefit or for the benefit of any other person, firm, corporation or other entity, and not for the benefit of the Company, any information acquired from the Company or its affiliates, without the express prior written consent of an authorized executive officer of the Company or if required by law, court order or unless needed to collect or retrieve past due monies or balances unpaid for more than 90 days.

Agreement between the Company and Consultant dated 2/5/2012.
Consultant accepts this Non-Disclosure term: _____ (Signature)

### RIGHTS TO WORK
The parties acknowledge that any work created by Consultant in connection with the performance of services for the Company pursuant hereto is being created at the insistence of the Company and shall be deemed "Company Property" under the United States copyright laws. The Company shall have the right to use the whole work, any part or parts thereof, or none of the work, as it sees fit. The Company may alter the work, add to it, or combine it with any other work or works, at its sole discretion. Notwithstanding the foregoing, all original material submitted by Consultant as part of the work or as part of the process of creating the work, including but not limited to programs, listings, printouts, documentation, notes, flow charts, and programming aids, shall be the property of the Company whether or not the Company uses such material. Consultant reserves no rights for ownership of any kind unless Company provides Consultant with an agreement signed by both parties agreed to an ownership claim to the work or property created by the consultant. Consultant must have a written signed witnessed agreement showing the Owner John Palmer has agreed to the ownership of the work or trademark.

All programs, specifications, documentation and all other technical information prepared by Consultant in connection with the performance of his services hereunder will become the Company's sole property immediately after being sent by Consultant. Title to all material and documentation, including but not limited to, systems specifications furnished by the Company to Consultant or delivered by the Company into Consultant's possession shall remain with the Company.

### ADDED BY JP REQUEST – OWNERSHIP OF PAST WORK AND PRODUCTS
Consultant hereby grants, assigns and conveys to the Company all right, title and interest in and to all past current and future inventions, works of authorship, trade secrets and other proprietary data and all other materials (as well as the copyrights, patents, trade secrets and similar rights attendant hereto) conceived, reduced to practice, authored or developed by Consultant, either solely or jointly with others, during and in connection with the performance of services under this Agreement with the Company. Consultant agrees that he will not seek patent, copyright, trademark, registered design or other protection for any rights in any such inventions, works of authorship, proprietary data or

other materials. Consultant shall have no right to disclose or use any such inventions, works of authorship, trade secrets and proprietary data or other materials for any purpose whatsoever and shall not communicate to any third party the nature of or details relating to such inventions, works of authorship, proprietary data or other materials.

Consultant agrees that at the Company's expense, he shall do all things and execute all documents as the Company may reasonably require vesting in the Company or its nominees the rights referred to herein and to secure for the Company or its nominees all patent, trademark, and trade secret copyright protection as directed. Consultant's obligations under this Section shall survive expiration or termination of the Agreement and any amendments thereto.

Consultant agrees he will not disclose to any third party, without prior written consent of the Company, any invention or discovery made under or relating to this Agreement or any proprietary or confidential information acquired from the Company under this Agreement, including trade secrets, business plans and confidential or other information which may be proprietary to the Company, all of which shall be subject to the Non-disclosure Agreement.

Consultant agrees to notify the Company immediately of any extortive solicitation, demand, or other request for anything of value, by or on behalf of any entity or individual, relating to the subject matter of this Agreement

## PAST WORK & CONSULTING AGREEMENTS

This Agreement replaces and supersedes all prior consulting agreements, and any other agreements relating to the subject matter hereof, between the parties to this agreement. All past and current work, products or trademarks that pre-date this agreement are now final and property of the company.

Agreed to on first written above.

Steve Aeschliman (Owner)
CCP Consulting (Sole Proprietor)

By: _____

Print Name: _Steve Aeschliman_

Title: _Account Consultant_
_CCP Agent_
_& Owner_

Dealer Marketing Services Inc.

By: _____

Print Name: _John Palmer_

Title: _President & CEO_

1/01/2012                                                                                              7